Case No. 8:15-cv-00614-CEH

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

---

Target National Bank,

Appellant,

v.

Angela Welch, as Chapter 7 Trustee,

Appellee.

---

Appeal from the United States Bankruptcy Court
for the Middle District of Florida

Bankruptcy Case No. 8:10-bk-20178-CPM
Adversary Proceeding No. 8:12-ap-145-CPM

Hon. Catherine Peek McEwen,
United States Bankruptcy Judge

---

## APPELLANT TARGET NATIONAL BANK'S BRIEF

---

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Sherilee J. Samuel,
  Florida Bar No. 017499,
  sherilee.samuel@hwhlaw.com
R. Travis Santos,
  Florida Bar No. 077075,
  tstantos@hwhlaw.com
Hill Ward Henderson, PA
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
Ph. 813.221.3900
Fax 813.221.2900

Attorneys for Appellant Target National Bank

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

----------------------------------------------------------------------------------------

Target National Bank,

No. 8:15-cv-614-T-36

Appellant,

v.

Angela Welch, as Chapter 7 Trustee,

Appellee.

---

**APPELLANT TARGET NATIONAL BANK'S
CERTIFICATE OF INTERESTED PERSONS
AND
CORPORATE DISCLOSURE STATEMENT**

---

I hereby disclose the following pursuant to this Court's interested persons order:

1.)  the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action — including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to any party in the case:

Amcrest LLC

Bedell, George Chester, III

Dayton Credit Company

Dykema Gossett PLLC

Explorer Enterprise Holdings LLC

Glendale West, LLC

Grace, Kenneth Cleburne

Hill Ward Henderson, P.A.

1

Lash, Thomas A.

Lash Wilcox & Grace PL

Melendez, Brian

Nicollet Enterprise 1 S.à r.l.

Nicollet Enterprise 3 S.à r.l.

Nicollet Enterprise Holdings Canada LLC

Nicollet Enterprise Holdings Canada LP

Nicollet Enterprise GP Holdings S.C.S.

Nicollet Enterprise GP, LLC

PP&E, LLC

PoweredAnalytics, Inc.

Red Tail, LLC

Samuel, Sherilee J.

STL of Nebraska, Inc.

SuperTarget Liquor of Massachusetts, Inc.

SuperTarget Liquor of Missouri, Inc.

SuperTarget Liquor of Texas, Inc.

Target Bank

Target Brands, Inc.

Target Bridges, Inc.

Target Canada Co.

Target Canada Health Co.

Target Canada Mobile GP Co.

Target Canada Mobile LP

Target Canada Property LLC

Target Canada Property LP

Target Canada Pharmacy (BC) Corp.

Target Canada Pharmacy Corp.

Target Canada Pharmacy Franchising LP

Target Canada Pharmacy (Ontario) Corp.

Target Canada Pharmacy (SK) Corp.

Target Canada Property Holdings GP, LLC

Target Canada Property Holdings One LP

Target Canada Property Holdings Two LP

Target Capital Corporation

Target Clinic Medical Associates Florida, LLC

Target Clinic Medical Associates Illinois, LLC

Target Clinic Medical Associates Maryland, LLC

Target Clinic Medical Associates Minnesota, LLC

Target Clinic Medical Associates North Carolina, PLLC

Target Clinic Medical Associates Texas, LLC

Target Clinic Medical Associates Virginia, LLC

Target Commercial Interiors, Inc.

Target Connect, Inc.

Target Corporate Services, Inc.

Target Corporation

Target Corporation India Private Limited

Target Customs Brokers, Inc.

Target Domain Holdings, LLC

Target Enterprise, Inc.

Target Food, Inc.

Target General Merchandise, Inc.

Target Global Trade, Inc.

Target Jefferson Boulevard, LLC

Target Medford Urban Renewal, L.L.C

Target Millville Urban Renewal, L.L.C.

Target Receivables LLC

Target Services, Inc.

Target Sourcing Services Pensionsverwaltung GmBH

Target Sourcing Services Asia Limited

Target Sourcing Services Co., Ltd.

Target Sourcing Services Guatemala Compañia Limitada

Target Sourcing Services Hong Kong Limited

Target Sourcing Services India Private Limited

Target Sourcing Services Italy S.r.l.

Target Sourcing Services Korea Corporation

Target Sourcing Services Limited

Target Sourcing Services LLC

Target Sourcing Services Nicaragua & Compania Limitada

Target Sourcing Services Pacific Limited

Target Sourcing Services Singapore Pte. Ltd.

Target Stafford Urban Renewal, L.L.C.

Target Stores, Inc.

Target Wilson Yard QALICB, LLC

TCC Cooking Co.

Dermstore LLC

PoweredAnalytics, Inc.

Red Cart Ventures LLC

Retail Activation Services LLC

STL Licensing, Inc.

STL of Hawaii, Inc.

TCC Corporation S.à r.l.

TCDC, Inc.

TG Holdings

TG Holdings Canada LP

TG Holdings U.S., LLC

TSS Holdings S.C.S.

TSS Holdings, Inc.

TSS Holdings, LLC

TSS One Limited

TSS Two Limited

Westbury Holding Company

2.   the name of every other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings:

None known.

3.   the name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors' committee (or twenty largest unsecured creditors) in bankruptcy cases:

5

None known.

4.   the name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

The Plaintiff-Appellee claims that Debtor Donna L. Ward was the victim of alleged wrongful civil conduct.

I hereby certify that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the district judge and magistrate judge assigned to this case, and will immediately notify the Court in writing on learning of any such conflict.

April 6, 2015.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez

Brian Melendez, Fla. Bar No. 0103559
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Ph. 612.486.1589
Fax 866.637.2804
bmelendez@dykema.com

in association with

HILL WARD HENDERSON
Sherilee J. Samuel, Fla. Bar No. 017499
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
Ph. 813.227.8407
Fax 813.221.2900
sherilee.samuel@hwhlaw.com

Attorneys for Defendant
    Target National Bank

**Certificate of Service**

I hereby certify that on April 6, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

April 6, 2015.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez
_____

Brian Melendez, Fla. Bar No. 0103559
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Ph. 612.486.1589
Fax 866.637.2804
bmelendez@dykema.com

MSP01\155410.1
ID\BRM - 110048\0017

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iv

Jurisdictional Statement ...................................................................... 1

    I.      Basis for the Bankruptcy Court's subject-matter jurisdiction .... 1

    II.    Basis for the District Court's jurisdiction .................................. 1

    III.   Filing dates establishing the timeliness of this appeal ............... 1

    IV.   Assertion that the appeal is from a final judgment ..................... 2

Statement of the Issues ........................................................................ 3

Statement of the Case .......................................................................... 5

    I.      Facts relevant to the issues submitted for review ...................... 6

    II.    Procedural history .................................................................... 10

    III.   Rulings presented for review .................................................... 10

Summary of the Argument .................................................................. 12

    I.      Florida Consumer Collection Practices Act ............................. 12

    II.    Telephone Consumer Protection Act ........................................ 15

Argument ............................................................................................ 19

    I.      Calling a debtor who will not pay does not violate the Florida
          Consumer Collection Practices Act. ........................................ 19

          A.    There is no explicit requirement that a creditor stop
               calling a debtor if the debtor can't or won't pay, or asks
               that the creditor cease communication. .......................... 22

B.    A creditor can call a debtor who can't or won't pay, or who asks that the creditor cease communication, without violating the Florida Act as a matter of law...................25

    1.    Florida courts have held that the Act must be read in a way that allows creditors "latitude" in their collection practices and does not foment litigation. ..............................................................................25

    2.    A creditor may keep calling a debtor who will not pay as long as the calls are made for permissible purposes and cannot "reasonably be expected to abuse or harass the debtor." ................................26

C.    Target was calling Ms. Ward for permissible purposes, and did not "abuse or harass" her in any way...............28

II.    Target was not calling more often than the law allows............31

III.    Target did not violate the Telephone Consumer Protection Act because Ms. Ward gave her prior express consent for Target to call her using an automatic telephone dialing system, and she never revoked that consent. .......................................................34

A.    Ms. Ward consented to calls on her cell-phone number. ........................................................................................35

B.    Ms. Ward could not unilaterally revoke her prior express consent because that consent was embodied in a bilateral contract. ..........................................................................35

C.    The 2015 FCC Order is not retroactive, and any retroactive application would violate due process. ........40

D.    The Bankruptcy Court clearly erred when it held that Mr. Ward revoked Ms. Ward's prior express consent. .........45

    1.    Mr. Ward could not revoke his wife's prior express consent. ..............................................................45

2.  The evidence consistently showed that Mr. Ward's attempted revocation occurred on the Wards' landline, not on a cellular telephone — until Mr. Ward switched his testimony during the trial...... 47

3.  The evidence does not support the Bankruptcy Court's calculation of when Mr. Ward supposedly revoked his wife's consent for calls to the joint cellular telephone. ................................................ 50

Conclusion.................................................................................................... 54

Certificate of Compliance with Rule 8015(a)(7)(B)

Certificate of Service

iii

# Table of Authorities

## Cases

*Ahlers Bldg. Supply, Inc.*,
535 N.W.2d 431 (S.D. 1995) .................................................................. 32

*Arteaga v. Asset Acceptance, LLC*,
733 F. Supp. 2d 1218 (E.D. Cal. 2010) ................................................. 26

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ............................................................................... 35

*Buchholz v. Valarity, LLC*,
No. 4:13CV362 TIA, 2014 U.S. Dist. LEXIS 159239 (E.D.
Mo. Nov. 12, 2014) ................................................................................ 30

*Cambron v. Med. Data Sys., Inc.*,
379 B.R. 371 (M.D. Ala. 2007) ............................................................. 20

*Christopher v. SmithKline Beecham Corp.*,
___ U.S. ___, 132 S. Ct. 2156 (2012) ......................................... 35, 36, 37

*Cokeley v. Midland Credit Mgmt., Inc.*,
No. 2:13-cv-02518-JWL, 2014 U.S. Dist. LEXIS 149430
(D. Kan. Oct. 21, 2014) .......................................................................... 23

*Dyer v. Select Portfolio Servicing, Inc.*,
No. 5:15-cv-121-Oc-30PRL, 2015 U.S. Dist. LEXIS 72341
(M.D. Fla. June 4, 2015) ........................................................................ 22

*FCC v. Fox Television Stations, Inc.*,
___ U.S. ___, 132 S. Ct. 2307 (2012) ............................................. 36, 38

*Gager v. Dell Fin. Servs., LLC*,
727 F.3d 265 (3d Cir. 2013) ................................................................... 31

*Gillespie v. Chase Home Fin., LLC,*
No. 3:09-CV-191-TS, 2009 U.S. Dist. LEXIS (N.D. Ind.
Nov. 20, 2009)......................................................................23

*Helman v. Udren Law Offices, P.C.,*
85 F. Supp. 3d 1319, 1324–28 (S.D. Fla. 2014) ......................22

*Johnston v. USAA Fed. Savs. Bank,*
No. 12-cv-02486-LTB-KLM, 2014 U.S. Dist. LEXIS
152408 (D. Colo. Oct. 27, 2014)............................................32

*Mammen v. Bronson & Migliaccio, LLP,*
715 F. Supp. 2d 1210 (M.D. Fla. 2009)..................................26

*Meadows v. Franklin Collection Serv., Inc.,*
414 F. App'x 230 (11th Cir. 2011) .........................................21

*Mimbs v. J.A. Cambece Law Office, P.C.,*
No. 0:12-cv-62200-WPD (S.D. Fla. July 31, 2013) ...........24, 25

*Osorio v. State Farm Bank, F.S.B.,*
746 F.3d 1242 (11th Cir. 2014)...................................31, 32, 34

*Reid v. GE Capital Retail Bank,*
No. CV 114-079, 2014 U.S. Dist. LEXIS 170267 (S.D. Ga.
Dec. 9, 2014) ......................................................................32

*In re Rules & Regulations Implementing TCPA,*
23 FCC Rcd. 559 (FCC 2008) ...............................................29

*In re Rules and Regulations Implementing the Telephone
Consumer Protection Act of 1991,*
___ FCC Rcd. 7961, 2015 FCC LEXIS 1586 (FCC July 10,
2015).................................................................................34

*Santoro v. CTC Foreclosure Serv. Corp.,*
12 F. App'x 476 (9th Cir. 2001) ............................................22

*Schauer v. Morse Operations, Inc.*,
    5 So. 3d 2 (Fla. 4th Dist. Ct. App. 2009) ............................................. 20, 21

*Sembler v. Attention Funding Trust*,
    No. 07 CV 2493(RJD)(LB), 2009 WL 2883049 (E.D.N.Y.
    Sept. 3, 2009), *report & recommendation adopted*, 2009 WL
    3055347 (E.D.N.Y. Sept. 24, 2009)............................................................. 17

*Shuler v. Ingram & Assocs.*,
    710 F. Supp. 2d 1213 (N.D. Ala. 2010)..................................................... 26

*St. Joe Corp. v. McIver*,
    875 So. 2d 375 (Fla. 2004)......................................................................... 31

*Story v. J.M. Fields, Inc.*,
    343 So. 2d 675 (Fla. 1st Dist. Ct. App. 1977).................................... 20, 21

*Tucker v. CBE Group, Inc.*,
    710 F. Supp. 2d 1301 (M.D. Fla. 2010)..................................................... 27

*Wright v. Bush Ross, P.A.*,
    No. 8:07-cv-1885-T-23MAP, 2008 WL 190466 (M.D. Fla.
    Jan. 18, 2008) ............................................................................................ 27

## Statutes

15 U.S.C. § 1692c(c)...................................................................................... 17

47 U.S.C. § 227(b)(1)(A)(iii) ........................................................................ 28

Fair Debt Collection Practices Act............................................................*passim*

Fair Debt Collection Practices Act, 15 U.S.C. § 1692b–92g........................ 16

Fla. Stat. § 559.72........................................................................................... 16

Fla. Stat. § 559.72(7)...................................................................................... 13

Florida Consumer Collection Practices Act................................................*passim*

FLSA ............................................................................................................ 37

Telephone Consumer Protection Act ........................................... 28, 34, 35, 46

## Other Authorities

National Consumer Law Center, *Fair Debt Collection* (8th ed.
2014) ......................................................................................................... 17

## Jurisdictional Statement

I.  **Basis for the Bankruptcy Court's subject-matter jurisdiction**

The Bankruptcy Court had jurisdiction of this action under 28 U.S.C. § 157(b)(2)(O).

II.  **Basis for the District Court's jurisdiction**

This Court has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1).

III.  **Filing dates establishing the timeliness of this appeal**

Rule 8002 provides that "a notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."[1] The judgment of the Bankruptcy Court, titled "Final Judgment," was entered on March 2, 2015.[2] Defendant Target National Bank's Notice of Appeal was filed with the Bankruptcy Clerk on March 16, 2015.[3]

---

[1]Fed. R. Bankr. Proc. 8002(a)(1).

[2]A056–58.

[3]A059–62.

1

## IV.  Assertion that the appeal is from a final judgment

This appeal is taken from the judgment of the Bankruptcy Court, titled "Final Judgment," entered on March 2, 2015.

## Statement of the Issues

Pursuant to Rule 8014(a)(5), Target states that these issues are presented for review, with a concise statement of the applicable standard of appellate review:[4]

    1.    Can a creditor call a debtor who can't or won't pay, or who asks that the creditor cease communication, without violating the Florida Consumer Collection Practices Act as a matter of law? Can a creditor call a debtor whose spouse says that she can't or won't pay, or whose spouse asks that the creditor cease communication, without violating the Florida Consumer Collection Practices Act as a matter of law? The standard of review is de novo.

    2.    Can "prior express consent" under the Telephone Consumer Protection Act be unilaterally revoked when the consent is embodied in a bilateral written agreement?

        (a)    If so, can the prior express consent be revoked orally?

---

[4]*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1296 (11th Cir. 2009) ("we review the bankruptcy court's factual findings for clear error, and its legal conclusions de novo").

3

(b)    If so, can the prior express consent be revoked by a spouse who is not a party to the written agreement but who jointly holds the phone number?

The standard of review is de novo.

3.    Was the trial court's finding that Mr. Ward was using a cellular telephone when he told Target to stop calling contrary to the evidence? The standard of review is clear error.

## Statement of the Case

The Plaintiff claims that Target[5] violated the Florida Consumer

Collection Practices Act and the Telephone Consumer Protection Act by

calling Debtor Donna L. Ward in June–August 2010 about her overdue

credit-card account.[6] The part of the Florida Consumer Collection Practices

Act that Target allegedly violated provides that

> In collecting consumer debts, no person shall:
>
> . . . .
>
> (7)  Willfully communicate with the debtor or any
> member of her or his family with such frequency
> as can reasonably be expected to harass the debtor
> or her or his family, or willfully engage in other
> conduct which can reasonably be expected to
> abuse or harass the debtor or any member of her or
> his family.[7]

The Plaintiff claims that Target violated the Telephone Consumer Protection

Act by calling after being asked to stop.

---

[5]On March 13, 2013, Target National Bank sold all its credit-card
accounts and associated receivables to another bank; merged into Target
Corporate Services, Inc.; and ceased to exist. For convenience, this
memorandum refers to the Defendant and its successor, Target Corporate
Services, Inc., as "Target" or "Target National Bank."

[6]Compl., ¶ 12 [A032]; *id.*, ¶ 15 [A032]; *id.*, ¶ 21 [A033–34]; *id.*, ¶ 23
[A034–35]; *id.*, ¶ 25 [A035]; *id.*, ¶ 33 [A037].

[7]Fla. Sta. § 559.72(7) (prohibited practices generally).

## I.  Facts relevant to the issues submitted for review

Ms. Ward opened a Target credit-card account on February 2008[8] with an account number ending in -7-492.[9] When Ms. Ward opened that account, she agreed to the terms and conditions in the applicable Credit Card Agreement. The agreement to whose terms Ms. Ward agreed when she applied for the -492 account provides: "**COMMUNICATIONS WITH YOU** — We [Target] or our agents may call by telephone regarding your Account. You agree that we may place such calls using an automatic dialing/announcing device. You agree that we may make such calls to a mobile telephone or other similar device. . . ."[10] Ms. Ward's application for the -492 account listed her home phone as 813.982.9181, and her work or secondary phone as 813.778.1034.[11]

Ms. Ward used her credit cards to make purchases, and she made payments toward her account. But in 2010, her account became past due. On March 17, 2010, Ms. Ward called Target about the then-overdue -492

---

[8]Trial Tr., A121:13–23 (S. Wolf).

[9]*Id.*, A122:10–24.

[10]Credit Card Agreement, ¶ 12 [A221]; Trial Tr., A090:19–25 (Ms. Ward); *id.*, A123:10 – A124:2 (S. Wolf).

[11]Application [A217]; Trial Tr., A121:25 – A122:4 (S. Wolf).

account. She canceled the automatic payments that she had set up,[12] and she promised to pay the overdue amount.[13] She wanted to pay her bills and meet her obligations, so she worked out a temporary special payment plan with Target,[14] under which Target agreed to "[a] lower minimum monthly payment," "[a] lower annual percentage rate for purchases," and "[n]o late fees."[15] The plan was set up to last six months[16] — that is, until September 2010.

By June 2010, the account was again overdue, so Target began calling Ms. Ward. Target called Ms. Ward about her overdue -492 account from June 7 through August 30, 2010.[17] Ms. Ward's application for the -492 account listed her home phone as 813.982.9181, and her work or secondary phone as 813.778.1034.[18] Target's records refer to the 813.982.9181 number

---

[12]TSYS Archived Notes (call dated "17MAR2010" at time "12:08:16") [A227].

[13]*Id.* (call dated "17MAR2010" at time "12:11:25").

[14]Trial Tr., A092:5–16 (Ms. Ward); *id.*, A137:1–16 (S. Wolf).

[15]Letter from Target to Ward [A233]; Trial Tr., A138:1–12 (S. Wolf).

[16]Trial Tr., A138:22–23 (S. Wolf).

[17]Trial Tr. [Doc. 9-9], 163:21 – 164:2 (S. Wolf).

[18]Trial Tr., A084:15 – A086:11 (Ms. Ward); *id.* at A110:18 – A111:18 (Mr. Ward); *id.* at A121:24 – A122:4 (S. Wolf).

as the "home phone," and the 813.778.1034 number as the "work phone."[19] The 813.982.9181 number was a land line.[20] The 813.778.1034 number was a cell-phone line that Ms. Ward and her husband held jointly,[21] but which they used as Mr. Ward's cellular telephone,[22]; which Ms. Ward did not answer.[23]

Target called only Ms. Ward, not Mr. Ward, since Mr. Ward was not a party to Ms. Ward's credit-card accounts.[24] Target called her 52 times over 55 days.[25] Target never called more than six times in a single day, and "called that often only because nobody answered the phone."[26] Target

---

[19]*Id.*, A141:14–22 (S. Wolf); *id.*, A099:7–9 (Mr. Ward).

[20]*See, e.g., id.*, A081:6–20 (Ms. Ward) (distinguishing "home phone" from cell phones).

[21]*Id.*, A112:14–21 (Mr. Ward).

[22]*Id.*, A099:13–15 (Mr. Ward).

[23]*Id.*, A099:16–17 (Mr. Ward); *see also* Doc. 9-9 at 23:35 – 24:6 (Ms. Ward); *id.* at 56:1–2 (Ms. Ward).

[24]Trial Tr., A081:21–23 (Ms. Ward); *id.*, A092:17–19 (Ms. Ward); *id.*, A152:21–25 (S. Wolf).

[25]*Id.*, A139:25 – A140:14 (S. Wolf).

[26]*Id.*, A140:15–20 (S. Wolf).

reached a human being five times,[27] and never connected with Ms. Ward herself.[28]

When calling 813.788.1034, Target never left a message on an answering machine or voicemail.[29] Target reached a human being on three occasions. The TSYS archived notes,[30] which record Target's contacts with a called party, contain these summaries of those three conversations:

| Date | Time | Operator ID | Caller | Event Reference |
|---|---|---|---|---|
| 07JUN2010 | 14:06:34 | ZG9407 | | Wrong party, Guest not home |
| 01JUL2010 | 12:37:01 | ZG8741 | Lizette O'Connell[31] | Guest not home |
| 12JUL2010 | 14:02:42 | V05604 | Nancy Nelson[32] | "TT [talked to] spouse (they are separated so didn't discuss acct) sd wld have her call us" |

---

[27]*Id.*, A140:23–25 (S. Wolf).

[28]*Id.*, A140:21–22 (S. Wolf).

[29]Trial Tr., A146:1–6 (S. Wolf).

[30]TSYS Notes [A227–28].

[31]Trial Tr., A183:14–17 (L. O'Connell).

[32]*Id.*, A208:14–22 (N. Nelson).

Mr. Ward told Target on June 9, 2010, that Ms. Ward was unable or unwilling to pay her overdue credit-card bill on the -492 account. That conversation occurred on the Wards' home phone.[33] As a result, Target stopped calling for 20 days, until June 29, 2010.[34]

The Wards filed for bankruptcy on August 23, 2010. Their voluntary petition listed the -492 account as a joint account.[35]

## II. Procedural history

This case was tried before the Bankruptcy Court on August 14, 2013. The judgment of the Bankruptcy Court, titled "Final Judgment," was entered on March 2, 2015.[36]

## III. Rulings presented for review

The ruling presented for review is the judgment of the Bankruptcy Court (Hon. Catherine Peek McEwen, United States Bankruptcy Judge,

---

[33]TSYS Archived Notes ("TELEPHONED HOME PHONE") [A228].

[34]*See* TSYS Notes [A227].

[35]Voluntary Petition [A239].

[36]Final Judgment [A056–58].

presiding), titled "Final Judgment," entered in this case on March 2, 2015 [Doc. 143].

## Summary of the Argument

I.  **Florida Consumer Collection Practices Act**

It is perfectly lawful for a creditor, collecting its own debt in its own name, to communicate directly with a debtor — even if the debtor can't or won't pay. The creditor cannot abuse that right, and must exercise it judiciously, in a way that does not "abuse or harass the debtor or any member of her or his family." And while calling a debtor who can't or won't pay, or who asks that the creditor cease communication, may *sometimes* violate the Florida Consumer Collection Practices Act, there are circumstances where calling such a debtor does not violate the Act as a matter of law. Such circumstances are present here.

Yet throughout this adversary proceeding, the Bankruptcy Court viewed the law differently, believing that calling a debtor who can't or won't pay *necessarily* violates the Florida Consumer Collection Practices Act. The Bankruptcy Court's view is incorrect as a matter of law, and its finding of liability under the Florida Consumer Collection Practices Act is premised on that incorrect view.

There is no explicit requirement that a creditor stop calling a debtor if the debtor can't or won't pay, or asks that the creditor cease communication, so calling such a debtor is not a violation per se. And while calling a debtor who can't or won't pay, or who asks that the creditor cease communication, may *sometimes* violate the Florida Consumer Collection Practices Act, there are circumstances where calling such a debtor does not violate the Act as a matter of law. When a debtor can't or won't pay, litigation is not the creditor's only option, and the Florida Consumer Collection Practices Act must be read in a way that allows creditors "latitude" in their collection practices and does not foment litigation. Florida courts have so construed the Act for almost four decades. Florida courts have also articulated permissible purposes for which a creditor may keep calling a debtor who will not pay. There may be the rare case where a debtor tells the creditor "to stop bothering him and to take the matter to court." But most debtors do not volunteer to be the defendant in a collection lawsuit — after all, if a debtor is inclined toward a judicial resolution, bankruptcy is designed as a more attractive option. Short of the situation where a debtor actively invites litigation, a creditor can lawfully call a nonpaying debtor "to inform or

remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation." There are other lawful reasons as well.

There is no evidence that Target's calls to Ms. Ward could "reasonably be expected to abuse or harass the debtor." In fact, Target had just entered into a payment plan with her in March, at her request. She defaulted on that plan, so Target's calls in June through August were an attempt to follow up with her and get her account back on track: "Target started calling because she had fallen off a payment plan and was not paying the bill." Mr. Ward did not know about the payment plan that his wife had worked out. When Mr. Ward told Target on June 9, 2010, that Ms. Ward was unable or unwilling to pay her overdue credit-card bill on the -492 account, Target stopped calling for 20 days, until June 29, 2010. The fact that Target backed off for nearly three weeks shows that it was actively trying to *avoid* any abuse or harassment. But after some time had passed, Target checked in again — which is a perfectly acceptable measure, since circumstances and attitudes change over time, and Ms. Ward may have become able or willing to pay her bill after three weeks had elapsed.

Unfortunately, Target couldn't reach her to ask about whether she was now willing and able to pay, so it had no way of knowing whether her circumstances had changed — and calling her was the best way to find out.

A court can decide as a matter of law whether a creditor is calling more often than the law allows. Target is aware of no court anywhere having held that calling someone barely once a day on average violates any statutory prohibition. Target was not calling more often than the law allows. This Court should therefore reverse the Bankruptcy Court's judgment as to the claim under the Florida Consumer Collection Practices Act.

## II.  **Telephone Consumer Protection Act**

Target did not violate the Telephone Consumer Protection Act because Ms. Ward gave her prior express consent for Target to call her using an automatic telephone dialing system, and she never revoked that consent. This case is distinguishable from oral-revocation cases because Ms. Ward's prior express consent was reinforced by a written agreement. Ms. Ward admits that she could not unilaterally modify her credit-card agreement. Mr. Ward agreed that he could not, and did not, revoke his wife's prior express consent.

15

The Federal Communications Commission issued an order in July 2015 that altered the legal landscape under the Telephone Consumer Protection Act — ruling, among other things, that "consumers may revoke consent through any reasonable means." But the 2015 FCC Order is not retroactive, and any retroactive application would violate due process.

The Bankruptcy Court clearly erred when it held that Mr. Ward revoked Ms. Ward's prior express consent for calls to the -1034 number. When Target called that number, Mr. Ward treated the number as a shared number, and told Target nothing from which Target could have concluded that it wasn't Ms. Ward's number. The Bankruptcy Court found that both Ms. Ward and Mr. Ward were each other's agents with respect to the number. Both Ms. Ward and Ms. Ward evidently had common authority over the number, and Mr. Ward took messages for his wife at that number, thereby establishing himself as her agent for the purpose of reaching her at that number. Under those circumstances, he could not revoke her consent for calls to that number.

The evidence consistently showed that Mr. Ward's attempted revocation occurred on the Wards' land line, not on a cellular telephone —

until Mr. Ward switched his testimony during the trial. With the overwhelming weight of evidence that Mr. Ward's attempted revocation occurred on the Wards' land line, not on a cellular telephone, and with the only contrary evidence coming from a witness who was contradicting his own earlier testimony and who the Court knew was making things up, it was clear error to find that any attempted revocation occurred on a cellular telephone.

The Bankruptcy Court found "Mr. Ward . . . told Target . . . to stop calling his phone number." Even if that finding were correct, the Bankruptcy Court acknowledged that the trial record does not clearly establish when Mr. Ward told Target to stop calling his cellular telephone. Mr. Ward's testimony shows that he most likely told Target to stop calling his cellular telephone on July 12, 2010. Yet despite this evidence, the Bankruptcy Court found that Mr. Ward told Target to stop calling him on June 7, 2010. This Court should reverse the Bankruptcy Court's judgment as to the claim under the Telephone Consumer Protection Act. But if the Court finds that Mr. Ward did revoke his prior express consent, then it should find that the

revocation occurred not earlier than July 12, 2010, and that Target called Mr.

Ward's cellular telephone not more than 13 times after the revocation.

**Argument**

I.    **Calling a debtor who will not pay does not violate the Florida Consumer Collection Practices Act.**

It is perfectly lawful for a creditor, collecting its own debt in its own name, to communicate directly with a debtor — even if the debtor can't or won't pay. The creditor cannot abuse that right, and must exercise it judiciously, in a way that does not "abuse or harass the debtor or any member of her or his family."[37] And while calling a debtor who can't or won't pay, or who asks that the creditor cease communication, may *sometimes* violate the Florida Consumer Collection Practices Act, there are circumstances where calling such a debtor does not violate the Act as a matter of law. Such circumstances are present here.

Yet throughout this adversary proceeding, the Bankruptcy Court viewed the law differently, believing that calling a debtor who can't or won't pay *necessarily* violates the Florida Consumer Collection Practices Act. The Bankruptcy Court expressed that view when denying Target's motion for summary judgment — suggesting that, once a debtor (or, in this case, a

---

[37]Fla. Stat. § 559.72(7).

19

debtor's spouse) says that she can't pay the bill, the creditor's only option is

filing a lawsuit for collection, and any other approach violates the law:

> THE COURT: And I'd also want — I'm going to want to
> see evidence why does Target continue to call, period, instead
> of just suing. . . .
> But I'd like to hear about that at trial because I'm unsure
> why creditors continue to call and call and call and call when
> either there's no answer, which one would infer means they're
> ignoring it, or they flat out say, or someone says, they're not
> going to pay, regardless of the reason, because the creditor has
> the right to file suit.
> And I want to hear from someone within the collection
> industry why these calls continue to be made if it's not to harass
> someone into finally giving up and trying to pay a few pennies
> here and again on a payment plan.[38]

The Bankruptcy Judge was again critical of the collection industry at the

trial when she interrupted Target's attorney's opening argument to disdain a

term of art in the industry:

> [MR. MELENDEZ] . . . . All the collection activity on
> these accounts occurred on the 492 account. There was not a
> collection campaign on the 138 account. So the only—
> THE COURT: That's what you call it, a "collection
> campaign"?
> MR. MELENDEZ: Collection campaign, an effort to
> collect an outstanding debt.
> THE COURT: That's an odd phrase.
> MR. MELENDEZ: It's a phrase used in the industry,
> Your Honor. It doesn't have a pejorative connotation. It simply

---

[38]Hearing Tr., A065:12–25.

means an effort to contact a debtor who is behind in paying their debt. And I hope the Court won't read anything into that.

THE COURT: I won't. But I look at campaigns in terms of war. But go ahead.

MR. MELENDEZ: It's an industry term, Your Honor, and it doesn't have a militaristic connotation.

THE COURT: The industry should lose that. But go ahead.[39]

And when ruling against Target on the merits, the Bankruptcy Court repeated the view that calling a debtor who has expressed an inability to pay the debt constitutes harassment as a matter of law:

Let me drop maybe a footnote or a side comment about harassment. Mrs. Ward testified, or rather she wrote out on a questionnaire, that she did not feel harassed by Target's calling over and over again. She believed harassment should take the form of being mean or rude or using profane language or something like that.

The statute, however, says that — let me get the right language. The statute says that the action — if it can reasonably be expected to harass the Debtor, that's a violation. I think it can reasonably be expected to harass a Debtor or a member of the Debtor's family to keep calling after the person has said, "Stop calling," or she's filing bankruptcy or "we can't afford it." And so whether she felt harassed within her definition or not, it certainly meets the definition of the statute, which I should cite for the record is 559.72 sub (7).[40]

---

[39]Trial Tr., A077:21 – A078:17.

[40]Hearing Tr., A249:21 – A250:11.

The Bankruptcy Court's view is incorrect as a matter of law. The Bankruptcy Court's finding of liability under the Florida Consumer Collection Practices Act is premised on that incorrect view.

A. **There is no explicit requirement that a creditor stop calling a debtor if the debtor can't or won't pay, or asks that the creditor cease communication.**

The Fair Debt Collection Practices Act, the federal statute on which the Florida Consumer Collection Practices Act is largely based, mandates or prohibits conduct by debt collectors in 43 separate paragraphs, each containing one or more specific mandates or prohibitions.[41] The Florida Consumer Collection Practices Act prohibits 19 specific practices,[42] most (but not all) based on prohibitions from the federal statute, which requires or prohibits many acts that the Florida analog does not cover. One provision that the federal statute covers, but which Florida did not adopt, prohibits a creditor from communicating with a debtor who has asked that the creditor cease communication:

---

[41] *See* Fair Debt Collection Practices Act, 15 U.S.C. § 1692b–92g.

[42] Fla. Stat. § 559.72 (prohibited practices generally).

(c) **Ceasing communication**

    If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—

    (1)    to advise the consumer that the debt collector's further efforts are being terminated;

    (2)    to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

    (3)    where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.[43]

In earlier versions, which did not pass Congress, "the consumer's notice was not required to be in writing."[44] But in the enacted statute, written notice is essential, and a claim for violation fails unless the consumer asked *in writing* that the collector cease communication.[45]

---

[43] 15 U.S.C. § 1692c(c) (ceasing communication).

[44] National Consumer Law Center, *Fair Debt Collection* § 5.3.9.1 n.445 at 228 (8th ed. 2014) (citing H.R. 13720, 94th Cong. § 804(d) (1976); H.R. 29, 95th Cong. § 805(d) (1977)).

[45] *See Sembler v. Attention Funding Trust*, No. 07 CV 2493(RJD)(LB), 2009 WL 2883049, at *3 (E.D.N.Y. Sept. 3, 2009) ("Plaintiff fails to allege that he demanded in writing that the defendants cease communication. Without this, plaintiff fails to state a claim that defendants' ongoing

The Florida Legislature did not adopt the "ceasing communication" provision, and the Florida Act does not incorporate provisions from the Fair Debt Collection Practices Act that Florida did not adopt. A court cannot read that federal provision into the Florida statute where the Florida Legislature did not enact it. (And even if Florida had adopted the federal provision, Target would not have violated it.)

Here, Ms. Ward called Target, promised to pay the overdue amount, and worked out a temporary special payment plan, under which Target agreed to "[a] lower minimum monthly payment," "[a] lower annual percentage rate for purchases," and "[n]o late fees." The plan was "set up to last six months" — that is, until September 2010. Target was trying to reach Ms. Ward in June–August 2010 about the payment plan that she herself had called to set up. These facts cannot support a claim that Target was calling more often than the law allows, or that Target "engage[d] in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family."

---

communications were unlawful."), *report & recommendation adopted*, 2009 WL 3055347 (E.D.N.Y. Sept. 24, 2009).

B. **A creditor can call a debtor who can't or won't pay, or who asks that the creditor cease communication, without violating the Florida Act as a matter of law.**

There is no explicit requirement that a creditor stop calling a debtor if the debtor can't or won't pay, or asks that the creditor cease communication, so calling such a debtor is not a violation per se. And while calling a debtor who can't or won't pay, or who asks that the creditor cease communication, may *sometimes* violate the Florida Consumer Collection Practices Act, there are circumstances where calling such a debtor does not violate the Act as a matter of law.

1. **Florida courts have held that the Act must be read in a way that allows creditors "latitude" in their collection practices and does not foment litigation.**

When a debtor can't or won't pay, litigation is not the creditor's only option, and the Florida Consumer Collection Practices Act must be read in a way that allows creditors "latitude" in their collection practices and does not foment litigation. Florida courts have so construed the Act for almost four decades:

> Section 559.72(7) . . . recognizes that:
> "Unless some latitude is given the creditor to invade, to a reasonable extent, the debtor's right of privacy, without incurring liability, we may well end up

25

with the result that the creditor will find it preferable to proceed immediately with legal action when a debt becomes in default, without any warning to the debtor, rather than run the risk of being answerable to a supersensitive debtor . . . ."[46]

The "latitude" that the law allows to a collecting creditor includes the latitude to collect a debt by any lawful means. Some collectors believe that phone calls are more effective than written correspondence and other avenues as a means of collecting overdue debt.[47]

2. **A creditor may keep calling a debtor who will not pay as long as the calls are made for permissible purposes and cannot "reasonably be expected to abuse or harass the debtor."**

Florida courts have also articulated permissible purposes for which a creditor may keep calling a debtor who will not pay. There may be the rare case where a debtor tells the creditor "to stop bothering him and to take the

---

[46]*Story v. J.M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st Dist. Ct. App. 1977) (quoting *Household Fin. Corp. v. Bridge*, 250 A.2d 878, 885–86 (Md. 1969)); *Schauer v. Morse Operations, Inc.*, 5 So. 3d 2, 5 (Fla. 4th Dist. Ct. App. 2009) (quoting *Story*).

[47]*Cambron v. Med. Data Sys., Inc.*, 379 B.R. 371, 382 (M.D. Ala. 2007) (collector's chief operating officer "testified that they would not send the letters unless it was required by the Fair Debt Collection Practices Act, as he feels that the most effective means of collecting debts is by way of the telephone").

matter to court."[48] But most debtors do not volunteer to be the defendant in a collection lawsuit — after all, if a debtor is inclined toward a judicial resolution, bankruptcy is designed as a more attractive option. Short of the situation where a debtor actively invites litigation, a creditor can lawfully call a nonpaying debtor "to inform or remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation."[49] There are other lawful reasons as well.[50] In such cases, "[p]roof of numerous calls does not make a jury issue on liability,"[51] so judgment in the defendant's favor is appropriate.

---

[48]*Story v. J.M. Fields, Inc.*, 343 So. 2d 675, 676 (Fla. 1st Dist. Ct. App. 1977).

[49]*Id.* at 677; *Schauer v. Morse Operations, Inc.*, 5 So. 3d 2, 5 (Fla. 4th Dist. Ct. App. 2009) (quoting *Story*).

[50]*See, e.g., Meadows v. Franklin Collection Serv., Inc.*, 414 F. App'x 230, 234 (11th Cir. 2011) ("when a debt collector is told that a certain telephone number for a particular debtor is incorrect, the debt collector must be able to perform reasonable follow-up activities to ensure that the number they possess is actually incorrect").

[51]*Story*, 343 So. 2d at 677; *Schauer*, 5 So. 3d at 5.

### C. Target was calling Ms. Ward for permissible purposes, and did not "abuse or harass" her in any way.

There is no evidence that Target's calls to Ms. Ward could "reasonably be expected to abuse or harass the debtor." In fact, Target had just entered into a payment plan with her in March, at her request. The plan was "set up to last six months" — that is, until September 2010. She defaulted on that plan, so Target's calls in June through August were an attempt to follow up with her and get her account back on track: "Target started calling because she had fallen off a payment plan and was not paying the bill."[52] Mr. Ward did not know about the payment plan that his wife had worked out.[53] A communication "providing [the debtor] with information but not compelling or inducing him to take any action" does not constitute an unfair debt-collection practice.[54]

---

[52]Trial Tr., A135:14–15 (S. Wolf); *accord id.*, A138:23–24 (S. Wolf) ("The plan lasted six months. We started to call her in June of 2010 because she had stopped making payments.").

[53]Trial Tr., A106:22–24 (Mr. Ward).

[54]*Dyer v. Select Portfolio Servicing, Inc.*, No. 5:15-cv-121-Oc-30PRL, 2015 U.S. Dist. LEXIS 72341, at \*12 (M.D. Fla. June 4, 2015); *see also Santoro v. CTC Foreclosure Serv. Corp.*, 12 F. App'x 476, 480 (9th Cir. 2001) ("A letter suggesting loan workout options is not seeking to collect the debt."); *Helman v. Udren Law Offices, P.C.*, 85 F. Supp. 3d 1319, 1324–28

When Mr. Ward told Target on June 9, 2010, that Ms. Ward was unable or unwilling to pay her overdue credit-card bill on the -492 account, Target stopped calling for 20 days, until June 29, 2010. The fact that Target backed off for nearly three weeks shows that it was actively trying to *avoid* any abuse or harassment.[55] But after some time had passed, Target checked in again — which is a perfectly acceptable measure, since circumstances and attitudes change over time, and Ms. Ward may have become able or willing to pay her bill after three weeks had elapsed. Unfortunately, Target couldn't reach her to ask about whether she was now willing and able to pay, so it had no way of knowing whether her circumstances had changed — and calling her was the best way to find out:

> Q    Ms. Wolf, why would Target keep calling a cardholder when they've been told the cardholder can't pay their bill?
>
> A    Things change all the time, so — may have gotten a job, may have been able to pay off some other bills; I don't know. But things change for guests, and that happens on a consistent basis.

---

(S.D. Fla. 2014); *Gillespie v. Chase Home Fin., LLC*, No. 3:09-CV-191-TS, 2009 U.S. Dist. LEXIS, 108837, at *9–16 (N.D. Ind. Nov. 20, 2009).

[55] *See Cokeley v. Midland Credit Mgmt., Inc.*, No. 2:13-cv-02518-JWL, 2014 U.S. Dist. LEXIS 149430, at *14 (D. Kan. Oct. 21, 2014) ("no intent to harass may be inferred here from the volume and pattern of calls" where "defendant made only two calls to plaintiff, 20 days apart").

Q Okay. So why did Target keep calling Ms. Ward after her husband said, "Can't pay the bill"?

A We weren't calling Mr. Ward, we were calling Ms. Ward, and he doesn't have any say on her account.

Q Okay. Was Target ever able to reach Ms. Ward?

A No, we did not.[56]

The United States District Court for the Southern District of Florida, in *Mimbs v. J.A. Cambece Law Office, P.C.*,[57] recently granted a judgment on the pleadings in the defendant's favor on similar grounds. The *Mimbs* court held that "'a significant disparity between the number of telephone calls placed by Defendant and the number of actual successful conversations with Plaintiff' . . . suggests a difficulty of reaching Plaintiff, rather than an intent to harass." The *Mimbs* court applied that rule where the debt collector was reaching the debtor only one time out of seven, and cited a case where the debt collector had reached the debtor only one time out of five.[58] Here, out of 55 calls, Target reached a human five times — a ratio of one call out of 11 — and never connected with Ms. Ward herself.

---

[56]Trial Tr., A150:4–15 (S. Wolf).

[57]*Mimbs v. J.A. Cambece Law Office, P.C.*, No. 0:12-cv-62200-WPD (S.D. Fla. July 31, 2013).

[58]*Id.* at 10 (quoting *Saltzman v. I.C. Sys., Inc.*, No. 09-10096, 2009 WL 3190359, at *7 (E.D. Mich. Sept. 30, 2009)).

Therefore, while calling a debtor who can't or won't pay, or who asks that the creditor cease communication, may *sometimes* violate the Florida Consumer Collection Practices Act, there are circumstances where calling such a debtor does not violate the Act as a matter of law. Such circumstances are present here.

II.  **Target was not calling more often than the law allows.**

The evidence showed that—

- Target called Ms. Ward from June 7, 2010, through August 30, 2010.

- Target called her 52 times over 55 days.[59]

- Target never called more than six times in a single day, and "called that often only because nobody answered the phone."[60]

- Target reached a human being five times,[61] and never connected with Ms. Ward herself.[62]

---

[59]*Id.*, A139:25 – A140:14 (S. Wolf).

[60]*Id.*, A140:15–20 (S. Wolf).

[61]*Id.*, A140:23–25 (S. Wolf).

[62]*Id.*, A140:21–22 (S. Wolf).

- When calling 813.788.1034, Target never left a message on an answering machine or voicemail.[63]

- Target's callers were never rude or threatening.[64]

A court can decide as a matter of law whether a creditor is calling more often than the law allows.[65] Target is aware of no court anywhere having held that calling someone barely once a day on average violates any statutory prohibition. And even when Target attempted six calls per day to Ms. Ward without reaching her, calling six times during the 13-hour window when collection calls are lawful — especially when the called debtor is not answering, and the creditor is not leaving messages — does not violate any statutory prohibition. This Court, applying the provision in the Fair Debt Collection Practices Act that prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including by

---

[63]Trial Tr., A146:1–6 (S. Wolf).

[64]*Id.*, A104:15–16 (Mr. Ward).

[65]*See, e.g., Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1226–28 (E.D. Cal. 2010); *Shuler v. Ingram & Assocs.*, 710 F. Supp. 2d 1213, 1223 (N.D. Ala. 2010); *Mammen v. Bronson & Migliaccio, LLP*, 715 F. Supp. 2d 1210, 1218 (M.D. Fla. 2009).

"[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number," has held that the defendant debt collector did not violate the statute as a matter of law where it "did not make more than seven calls on any given day"[66]:

> While the number of calls made during the relevant time period does seem somewhat high, Defendant only left a total of six messages, made no more than seven calls in a single day, and did not call back the same day after leaving a message. The evidence demonstrates that [the debt collector] placed each of its telephone calls with an intent to reach [the debtor] rather than an intent to harass Plaintiff.
> Thus, the circumstances here do not constitute a violation of Section 1692d(5) as a matter of law.[67]

A court applying the Florida Consumer Collection Practices Act should accord "great weight" to federal precedent applying the corresponding provision in the Fair Debt Collection Practices Act.[68]

---

[66]*Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301, 1303 (M.D. Fla. 2010).

[67]*Id.* at 1305.

[68]*Wright v. Bush Ross, P.A.*, No. 8:07-cv-1885-T-23MAP, 2008 WL 190466, at *2 (M.D. Fla. Jan. 18, 2008).

Target was not calling more often than the law allows. This Court should therefore reverse the Bankruptcy Court's judgment as to the claim under the Florida Consumer Collection Practices Act.

III.   **Target did not violate the Telephone Consumer Protection Act because Ms. Ward gave her prior express consent for Target to call her using an automatic telephone dialing system, and she never revoked that consent.**

The Telephone Consumer Protection Act provides that

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> > (A)   to make any call (*other than a call . . . made with the prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> . . .
>
> > (iii)   to any telephone number assigned to a . . . cellular telephone service . . . .[69]

Thus, "a call . . . made with the prior express consent of the called party" does not violate the Act.

---

[69]47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

A.    **Ms. Ward consented to calls on her cell-phone number.**

Ms. Ward gave to Target her prior express consent for Target to call her using an automatic telephone dialing system, and to call her cellular telephone, when she applied for the subject credit-card accounts and agreed to the applicable credit-card agreements' terms.

Under an applicable order from the Federal Communications Commission, "prior express consent is deemed to be granted . . . if the wireless number was provided by the consumer to the creditor, and . . . such number was provided during the transaction that resulted in the debt owed."[70] Target obtained Ms. Ward's "prior express consent" in the way that the FCC Order requires: Target obtained the number where it was calling her (813.778.1034) from Ms. Ward's credit-card application.

B.    **Ms. Ward could not unilaterally revoke her prior express consent because that consent was embodied in a bilateral contract.**

Courts around the country have been widely split about whether a consumer, having given prior express consent to be called on a cellular

---

[70]*In re Rules & Regulations Implementing TCPA*, 23 FCC Rcd. 559, 565 (FCC 2008).

telephone, can revoke that consent. A majority rule began to emerge in 2010–13 when several district courts in different federal circuits ruled that consent could not be revoked.

> Relying upon the TCPA's silence on the issue, some courts have held that the TCPA does not permit revocation, whether written or oral. *See, e.g.*, *Kenny v. Mercantile Adjustment Bureau, LLC.*, No. 10-CV-1010, 2013 U.S. Dist. LEXIS 62415, 2013 WL 1855782, at *7 (W.D.N.Y. May 1, 2013) (holding that the TCPA creates a "narrow statutory right not to receive automated calls on a cellphone. . . [and that one who] voluntarily gives it up need not have an opportunity to change his mind later; he has withdrawn from the protection of the statute"); *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 468-69 (E.D.N.Y. 2012); *Moore v. [Firstsource Advantage, LLC]*, 2011 U.S. Dist. LEXIS 104517, 2011 WL 4345703, at *14 (holding that a verbal request to cease debt collection calls to a cell phone is not sufficient to revoke prior express consent under the TCPA). In addition, some courts hold that consent may be revoked under the TCPA but that only written revocation will be effective. *Moltz v. Firstsource Advantage, LLC*, No. 08-CV-239S, 2011 U.S. Dist. LEXIS 85196, 2011 WL 3360010, at *15 (W.D.N.Y. Aug. 3, 2011) (requiring that revocation of consent under the TCPA must be in writing); *Starkey v. Firstsource Advantage*, No. 07-CV-662ASR, 2010 U.S. Dist. LEXIS 60955, 2010 WL 2541756, at *6 (W.D.N.Y. March 11, 2010) (holding that a verbal request to cease debt collection calls is sufficient under the TCPA).[71]

---

[71]*Buchholz v. Valarity, LLC*, No. 4:13CV362 TIA, 2014 U.S. Dist. LEXIS 159239, at *16–17 (E.D. Mo. Nov. 12, 2014).

But two years ago, the Third Circuit — the first appellate court to weigh in — broke that streak, and held that a consumer could revoke her consent;[72] last year, the Eleventh Circuit reached the same result.[73]

But even the courts that have found that a consumer can unilaterally revoke his consent have relied on the common law,[74] and the common law includes the law of contracts.[75] The common law of Florida, where Ms. Ward entered into the credit-card agreement, and the common law of South Dakota, whose law the credit-card agreement adopts,[76] both hold that a contracting party cannot unilaterally modify a contractual term.[77]

---

[72]*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 272 (3d Cir. 2013).

[73]*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014).

[74]*See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270–71 (3d Cir. 2013) ("Our holding that the TCPA allows consumers to revoke their prior express consent is consistent with the basic common law principle that consent is revocable."); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014) ("We instead presume from the TCPA's silence regarding the means of providing or revoking consent that Congress sought to incorporate 'the common law concept of consent.'").

[75]*See Osorio*, 746 F.3d at 1255 (holding that oral revocation was available "in the absence of any contractual restriction to the contrary").

[76]Credit Card Agreement, ¶ 13 [A221].

[77]*St. Joe Corp. v. McIver*, 875 So. 2d 375, 382 (Fla. 2004) ("a party cannot modify a contract unilaterally. All the parties whose rights or

The Eleventh Circuit explicitly acknowledged that oral revocation was available "in the absence of any contractual restriction to the contrary";[78] other courts have followed the Eleventh Circuit's lead and acknowledged that a contractual provision could alter the parties' relationship.[79] One court used a creditor's contract with the debtor in order to conclude that revocation *was* available: "My conclusion is supported by the circumstances present here in which Plaintiff is given the ability to revoke his consent — as governed by his online agreement with Defendant — which provides that he 'may' revoke . . . ."[80]

This case is distinguishable from the oral-revocation cases because Ms. Ward's prior express consent was reinforced by a written agreement.

---

responsibilities the modification affects must consent."); *Ahlers Bldg. Supply, Inc.*, 535 N.W.2d 431, 435 (S.D. 1995) ("Furthermore, substitution or modification of a contract cannot be effected by the sole action of one of the parties to it. The consent of both is required to alter or supplant a contract fairly made.").

[78]*See Osorio*, 746 F.3d at 1255.

[79]*See, e.g.*, *Reid v. GE Capital Retail Bank*, No. CV 114-079, 2014 U.S. Dist. LEXIS 170267, at *7 (S.D. Ga. Dec. 9, 2014) (citing *Osorio*).

[80]*Johnston v. USAA Fed. Savs. Bank*, No. 12-cv-02486-LTB-KLM, 2014 U.S. Dist. LEXIS 152408, at *10 (D. Colo. Oct. 27, 2014).

Ms. Ward admits that she could not unilaterally modify her credit-card
agreement:

> Q    Thank you. Did you think that you could modify any of
>      the terms of your agreements with Target? For example,
>      could you modify unilaterally your credit limit?
> A    No.
> Q    And you couldn't unilaterally modify the interest rate?
> A    No.
> Q    You couldn't unilaterally modify the minimum monthly
>      payment, for example?
> A    No.
> Q    Did you think you could modify any of the terms and
>      conditions of your agreement with Target?
> A    No.[81]

Likewise, she could not unilaterally modify the prior-express-consent
provision any more than she could unilaterally modify the credit limit,
interest rate, minimum payment, or other terms and conditions of her credit-
card account. Mr. Ward agreed that he could not, and did not, revoke his
wife's prior express consent:

> Q    Okay. I'd like to ask you to look at  one of your wife's
>      credit card agreements — well, actually, let me — let me
>      see if I can short circuit this. Are you aware that your
>      wife's credit card agreement contained a term in it where
>      she agreed to calls on the cell phone? It was read to her
>      today and she answered about it. Do you remember that?
> A    ████████████████████████████████████████████

---

[81]Trial Tr., A091:1–12 (Ms. Ward).

Q Yeah.
A █████
Q Okay. Do you believe that you had — that you, Mr.
Ward, had the ability to modify or revoke the terms in
that paragraph that gave the consent?
A ████████
Q Okay. Did you or your wife at any time take any action to
revoke the consent given in that paragraph?
A ████████████████[82]

## C. **The 2015 FCC Order is not retroactive, and any retroactive application would violate due process.**

The Federal Communications Commission issued an order in July

2015 that altered the legal landscape under the Telephone Consumer

Protection Act — ruling, among other things, that "consumers may revoke

consent through any reasonable means."[83] But the 2015 FCC Order is not

retroactive,[84] and any retroactive application would violate due process.

The Supreme Court has explained that

---

[82]*Id.*, A107:21 – A108:11 (Mr. Ward) (redaction ordered by
Bankruptcy Court).

[83]*In re Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991*, ___ FCC Rcd. 7961, 2015 FCC LEXIS 1586 (FCC
July 10, 2015).

[84]*See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th
Cir. 2014) ("This guidance [the 2012 FCC Order] is not dispositive of the
present case because the FCC issued its ruling after the calls in
question . . . .").

Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. *E. g.*, *Greene v. United States*, 376 U.S. 149, 160 (1964); *Claridge Apartments Co. v. Commissioner*, 323 U.S. 141, 164 (1944); *Miller v. United States*, 294 U.S. 435, 439 (1935); *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162-163 (1928). By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. *See Brimstone R. Co. v. United States,* 276 U.S. 104, 122 (1928) ("The power to require readjustments for the past is drastic. It . . . ought not to be extended so as to permit unreasonably harsh action without very plain words").[85]

Even if the Telephone Consumer Protection Act "conveyed . . . in express terms" retroactive regulatory authority upon the Federal Communications Commission, the Commission did not purport to exercise any such authority in the 2015 FCC Order. The Order is not, by its own terms, retroactive.

Furthermore, any retroactive application of the 2015 FCC Order would violate due process, because Target and other callers would have lacked fair notice of what the Telephone Consumer Protection Act requires and what it prohibits. The Supreme Court, in the closing weeks of its 2011–12 Term, decided two cases relevant to the fair-notice issue: *Christopher v.*

---

[85]*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

*SmithKline Beecham Corp.*, ___ U.S. ___, 132 S. Ct. 2156 (2012), and *FCC v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S. Ct. 2307 (2012).

*Christopher* was an action by pharmaceutical sales representatives (also known as "detailers") against a prescription-drug manufacturer for overtime compensation, to which the detailers' entitlement turned on whether they were "outside salesmen" within the applicable statute's meaning,[86] which turned on how the Department of Labor interpreted its own regulations: "Petitioners invoke the DOL's interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced."[87] The Supreme Court held that such liability would violate due process: "To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.' Indeed, it would result in precisely the kind of 'unfair surprise' against which our cases have long

---

[86]*Christopher v. SmithKline Beecham Corp.*, ___ U.S. ___, 132 S. Ct. 2156, 2164–65 (2012).

[87]*Id.*, 132 S. Ct. at 2167.

warned."[88] The *Christopher* Court explained that, until the Department of Labor announced its interpretation in 2009, "the pharmaceutical industry had little reason to suspect that its longstanding practice of treating detailers as exempt outside salesmen transgressed the FLSA. The statute and regulations certainly do not provide clear notice of this."[89] The Court found it significant that "despite the industry's decades-long practice of classifying pharmaceutical detailers as exempt employees, the DOL never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully."[90] The Court concluded that "where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute": "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable" down the road.[91]

---

[88]*Id.* (internal citations and footnote omitted).

[89]*Id.*

[90]*Id.* at 2168.

[91]*Id.*

*FCC v. Fox Television* was an enforcement action by the Commission where, "[e]ven though the incidents at issue took place before [the applicable order], the Commission applied its new policy regarding fleeting expletives and fleeting nudity" and "found the broadcasts by respondents . . . to be in violation of this standard."[92] The Supreme Court rejected the liability that the agency had imposed because "[t]he Commission failed to give [the respondents] fair notice prior to the broadcasts in question that fleeting expletives and momentary nudity could be found actionably indecent."[93] The Court clearly articulated the applicable rule:

> A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. . . . A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[94]

---

[92]*FCC v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S. Ct. 2307, 2315 (2012).

[93]*Id.* at 2320.

[94]*Id.* at 2317 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

To impose liability upon Target for failing to comply in 2010 with the 2015 FCC Order would violate due process.

      D.    **The Bankruptcy Court clearly erred when it held that Mr. Ward revoked Ms. Ward's prior express consent.**

Finally, the Bankruptcy Court clearly erred when it held that Mr. Ward revoked Ms. Ward's prior express consent for calls to the -1034 number.

      1.    **Mr. Ward could not revoke his wife's prior express consent.**

Ms. Ward gave to Target her prior express consent for Target to call her using an automatic telephone dialing system, and to call her cellular telephone, when she applied for the subject credit-card accounts and agreed to the applicable credit-card agreements' terms. But when Target called that number, Mr. Ward treated the number as a shared number, and told Target nothing from which Target could have concluded that it wasn't Ms. Ward's number:

Q      Okay. So, Mr. Ward, when Target called on your cell phone looking for your wife, did you tell the caller that your wife wasn't home?

A      ████████████████████████████

Q    Right. When somebody from Target called on your cell
     phone, did you tell the Target caller, "My wife's not
     home"?

A    

Q    Okay. More than once?

A    

Q    Okay. When Target called on your cell phone looking for
     your wife, did you tell the Target caller that you would
     give your wife a message?

A    

Q    Okay. More than once?

A    

Q    Okay. When Target called on your cell phone looking for
     your wife, do you have any specific recollection of
     giving your wife's phone number to the Target caller?

A    [95]

The Bankruptcy Court found that both Ms. Ward and Mr. Ward were each

other's agents with respect to the number.[96] Both Ms. Ward and Ms. Ward

evidently had common authority over the number, and Mr. Ward took

messages for his wife at that number, thereby establishing himself as her

agent for the purpose of reaching her at that number. Under those

circumstances, he could not revoke her consent for calls to that number.

---

[95]Trial Tr., A113:22 – A114:15 (Mr. Ward) (redaction ordered by
Bankruptcy Court).

[96]Hearing Tr., A069:8 ("A spouse is the agent of the other"); *id.*,
A070:2 ("the wife is an agent of the husband").

2. **The evidence consistently showed that Mr. Ward's attempted revocation occurred on the Wards' land line, not on a cellular telephone — until Mr. Ward switched his testimony during the trial.**

At his deposition, when he was asked about the calls on which he told

Target to stop calling, Mr. Ward testified that those calls came in on the

Ward's land line, not his cellular telephone:

Q    Okay. And do you remember exactly what it was that you said to Target or that the Target caller said to you other than what was reflected in the records we already went over?

A    

Q    Okay. And you remember specifically that call occurred on the *home phone*?

A

Q    Okay. Do you remember any other calls?

A

Q    Oh, really?

A



---

[97]Trial Tr., A117:20 – A118:16 (Mr. Ward) (emphasis added) (redaction ordered by Bankruptcy Court).

The Bankruptcy Court recognized during the trial that the calls involving

"████████████████████" were calls to the Ward's land line: "He could tell because there was caller ID on the TV. I'm aware of that system. It means that those calls came in in the land line."[98]

So Mr. Ward testified about a specific call that came in on the Wards' land line and, when asked about other calls, testified only about calls that also came in on a land line. And when he was asked the same question at trial, he couldn't remember any calls on a cellular telephone:

> Q    Okay. So when you told Target to stop calling, were you on a land line or on a cell phone?
> A    ████████████████████████[99]

Target's records also showed that Mr. Ward never told Target to stop calling on his cell phone.[100] So up to that point, the evidence — including Mr. Ward's testimony — was consistent, indeed unanimous, that Mr. Ward's attempted revocation occurred on the Wards' land line, not on a cellular telephone.

---

[98]*Id.*, A119:15–18.

[99]*Id.*, A115:2–4 (Mr. Ward) (redaction ordered by Bankruptcy Court).
[100]*Id.*, A152:17–20 (S. Wolf).

But Mr. Ward switched his story later in the trial, and testified that he had told Target to stop calling on his cellular telephone as well.[101] And it was that testimony that the Bankruptcy Court credited, even though the same Judge also found that Mr. Ward was shading his testimony untruthfully about another claim in the case:

> At our last time together, I did not fully explain or explicate why I disregarded Mr. Ward's trial testimony about that point, and so I think I should explain here. I discredited his trial testimony because of the deposition testimony.
>
> His trial testimony was that he was well versed in collection law, having worked at Badcock, and that a call after 9:00 p.m., he knew to be wrong. To me, a call after 9:00 p.m. to a person who is experienced in collection was something that would make a lasting impression and would be on the person's mind from the inception. And it was not on his mind at the deposition. He said in response to, I think it was Mr. . . . . Melendez's cross-examination, that he sat down and he thought hard about it, or words to that effect. I don't think he would have had to sit down and think hard about it or rethink it if the reason for his recall was as he articulated at trial. It would have been with him from the get-go. So on that point, I do not credit Mr. Ward's testimony.[102]

With the overwhelming weight of evidence that Mr. Ward's attempted revocation occurred on the Wards' land line, not on a cellular telephone, and with the only contrary evidence coming from a witness who was

---

[101]Id., A116:1–3 (Mr. Ward).

[102]Hearing Tr., A247:1–21.

contradicting his own earlier testimony and who the Court knew was making things up, it was clear error to find that any attempted revocation occurred on a cellular telephone.

> ### 3. The evidence does not support the Bankruptcy Court's calculation of when Mr. Ward supposedly revoked his wife's consent for calls to the joint cellular telephone.

The Bankruptcy Court found "Mr. Ward . . . told Target . . . to stop calling his phone number."[103] Even if that finding were correct, the Bankruptcy Court acknowledged that the trial record does not clearly establish when Mr. Ward told Target to stop calling his cellular telephone. The available possibilities are the three calls where Target called Mr. Ward's cellular telephone and reached a human being: June 7, 2010; July 1, 2010; and July 12, 2010. The following testimony from Mr. Ward sheds the most light on when he most likely told Target to stop calling his cellular telephone:

> Q. Okay. And when Target would call you, what would you say?
>
> A. ████████████████████████████████████

---

[103]Hearing Tr., A251:25 – A252:3.



Q. Okay. And about how many times did you speak to Target?

A. ███████████████████████████████████████

Q. And so you discussed that you may have told someone at one point that you were separated from your wife; is that true?

A. ████████[104]

Mr. Ward therefore █████████████████████████████████████

████████████████████████████████████████████. That

description matches Target's record of the call to Mr. Ward's cellular

telephone on July 12, 2010.

Mr. Ward did not testify about the June 7 call, and Target's records do

not show that Mr. Ward asked on the June 7 call for calls to stop.[105] If such a

---

[104]Trial Tr., A100:10 – A101:3 (Mr. Ward) (emphasis added) (redaction ordered by Bankruptcy Court).

[105]*See* TSYS Notes, A227.

request had been made, then it would appear in the call notes[106] — but those notes say only, "Wrong party, Guest not home,"[107] which is consistent with Mr. Ward's testimony that, ████████████████████████████████ ████████████████.[108] (He also testified that, ████████████████████ ████████████████████████████████████████,[109] which seems inconsistent with asking that calls stop.)

Yet despite this evidence, the Bankruptcy Court found that Mr. Ward told Target to stop calling him on June 7, 2010 — not based on any specific testimony or other evidence in the trial record, but because of her view that "June 7th is when Mr. Ward, a prior collector, would have told Target that this is his phone, not hers, they're not in a position to pay and don't call."[110] Based on that factually unsupported view, the Bankruptcy Court found that Target called 46 times after being told to stop.[111] But if the Court had relied on Mr. Ward's actual testimony, which Target's records partly corroborate,

---

[106]Trial Tr., A151:24 – A152:9.

[107]TSYS Notes, A227.

[108]Trial Tr., A114:1–5 (redaction ordered by Bankruptcy Court).

[109]*Id.*, A114:6–11.

[110]Hearing Tr., A265:9–12.

[111]*Id.*, A265:7; *id.*, A266:10.

and found that Target was told to stop on July 12, then Target called Mr. Ward's cellular telephone only 13 times after being told to stop.

This Court should reverse the Bankruptcy Court's judgment as to the claim under the Telephone Consumer Protection Act. But if the Court finds that Mr. Ward did revoke his prior express consent, then it should find that the revocation occurred not earlier than July 12, 2010, and that Target called Mr. Ward's cellular telephone not more than 13 times after the revocation.

## Conclusion

Therefore, Appellant Target National Bank respectfully asks that this Court reverse the Bankruptcy Court's judgment.

December 18, 2015.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez

_____

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

in association with

Sherilee J. Samuel,
  Florida Bar No. 017499,
  sherilee.samuel@hwhlaw.com
R. Travis Santos,
  Florida Bar No. 077075,
  tstantos@hwhlaw.com
Hill Ward Henderson, PA
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
Ph. 813.221.3900
Fax 813.221.2900

Attorneys for Appellant
  Target National Bank

**Certificate of Compliance with Rule 8015(a)(7)(B)**

This brief complies with the type-volume limitation of Rule
8015(a)(7)(B) because this brief contains 10,453 words, excluding the parts
of the brief exempted by Rule 8015(a)(7)(B)(iii).

December 18, 2015.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Attorney for Appellant
Target National Bank

### Certificate of Service

I hereby certify that on December 18, 2015:

1.  I electronically filed the foregoing redacted brief with the Clerk
    of the Court by using the CM/ECF system, which effected
    service upon George C. Bedell, III, Kenneth C. Grace, and
    Thomas A. Lash, attorneys for the Plaintiff-Appellee Trustee.

2.  I served an unredacted version upon Mr. Bedell, Mr. Grace, and
    Mr. Lash by postal mail at Lash, Wilcox & Grace PL, Suite
    320, 4950 West Kennedy Boulevard, Tampa, FL 33609.

December 18, 2015.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez

_____

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Attorney for Appellant
    Target National Bank