Case No. 8:15-cv-00614-CEH

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

———————————————————————————————

Target National Bank,

                                                                Appellant,

                        v.

Angela Welch, as Chapter 7 Trustee,

                                                                Appellee.

———————————————————————————————

Appeal from the United States Bankruptcy Court
for the Middle District of Florida

Bankruptcy Case No. 8:10-bk-20178-CPM
Adversary Proceeding No. 8:12-ap-145-CPM

Hon. Catherine Peek McEwen,
United States Bankruptcy Judge

———————————————————————————————

**APPELLANT TARGET NATIONAL BANK'S
REPLY BRIEF**

———————————————————————————————

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Sherilee J. Samuel,
    Florida Bar No. 017499,
    sherilee.samuel@hwhlaw.com
R. Travis Santos,
    Florida Bar No. 077075,
    tstantos@hwhlaw.com
Hill Ward Henderson, PA
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
Ph. 813.221.3900
Fax 813.221.2900

Attorneys for Appellant Target National Bank

# Table of Contents

Table of Authorities ........................................................................................ ii

Reply ............................................................................................................ 3

    I.     The appeal of the claim under the Florida Consumer Collection Practices Act involves only a question of law: whether the Bankruptcy Court is correct that calling a debtor who has expressed an inability to pay the debt constitutes harassment as a matter of law. .......................................................................... 6

    II.    The figure of "111 calls" in the Appellee's brief includes calls that were not made to the Wards. ............................................... 9

    III.   The cell-phone number that Target was calling was a joint line, so Ms. Ward could give prior express consent for calls to that line. ....................................................................................... 12

    IV.   Target's contractual consent provision is there so that Target can protect itself against disputed after-the-fact claims of oral revocation, not so that Target can keep calling. ....................... 14

    V.    Mr. Ward never testified about June 7, 2010 call, so the Bankruptcy Court's finding is based on speculation. ............. 17

    VI.   The Appellee's accusation of "Target knowingly with[olding] call records" is an unwarranted smear. .................................. 18

Conclusion .............................................................................................. 21

Certificate of Compliance with Rule 8015(a)(7)(B)

Certificate of Service

i

## Table of Authorities

### Cases

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
    567 F.3d 1291 (11th Cir. 2009) .................................................................7

*Reid v. GE Capital Retail Bank*,
    No. CV 114-079, 2014 U.S. Dist. LEXIS 170267 (S.D. Ga.
    Dec. 9, 2014).......................................................................................... 14

*Sembler v. Attention Funding Trust*,
    No. 07 CV 2493(RJD)(LB), 2009 WL 2883049, at *3
    (E.D.N.Y. Sept. 3, 2009), *report & recommendation
    adopted*, 2009 WL 3055347 (E.D.N.Y. Sept. 24, 2009) ....................... 8, 9

### Statutes

15 U.S.C. § 1692c(c) ............................................................................8

Fair Debt Collection Practices Act .................................................................8

Florida Consumer Collection Practices Act ............................................... 6, 7

Telephone Consumer Protection Act.................................................... 12, 15

### Other Authorities

National Consumer Law Center, *Fair Debt Collection* (8th ed.
    2014) .....................................................................................................8

# Reply

Target and Donna Ward shared a goal: they both wanted Ms. Ward to stay current on her payments toward the balance on her Target credit-card account. It was Ms. Ward who reached out to Target in March 2010 — months before Target began calling her — when her account became past due. Ms. Ward canceled the automatic payments that she had set up,[1] and she promised to pay the overdue amount.[2] She wanted to pay her bills and meet her obligations, so she worked out a temporary special payment plan with Target,[3] under which Target agreed to a lower minimum monthly payment, a lower interest rate, and no late fees.[4] The plan was set up to last six months[5] — that is, until September 2010.

---

[1]TSYS Archived Notes (call dated "17MAR2010" at time "12:08:16") [A227].

[2]*Id.* (call dated "17MAR2010" at time "12:11:25").

[3]Trial Tr., A092:5–16 (Ms. Ward); *id.*, A137:1–16 (S. Wolf).

[4]Letter from Target to Ward [A233]; Trial Tr., A138:1–12 (S. Wolf).

[5]Trial Tr., A138:22–23  (S. Wolf).

3

But by June 2010, the account was again overdue, so Target tried to call Ms. Ward. Target called her from June 7 through August 30, 2010.[6] Target called her 52 times over 55 days.[7] Target never called more than six times in a single day, and "called that often only because nobody answered the phone."[8] Target reached a human being five times,[9] and never connected with Ms. Ward herself.[10]

Target called only Ms. Ward, not Mr. Ward, since Mr. Ward was not a party to Ms. Ward's credit-card accounts.[11] But when Target called Ms. Ward, it was Mr. Ward who answered the phone — even though Target was calling only the numbers that Ms. Ward had listed on her application for the credit-card account.[12] Mr. Ward did not know about the payment plan that

---

[6]Trial Tr. [Doc. 9-9], 163:21 – 164:2 (S. Wolf).

[7]Trial Tr., A139:25 – A140:14 (S. Wolf).

[8]*Id.*, A140:15–20 (S. Wolf).

[9]*Id.*, A140:23–25 (S. Wolf).

[10]*Id.*, A140:21–22 (S. Wolf).

[11]*Id.*, A081:21–23 (Ms. Ward); *id.*, A092:17–19 (Ms. Ward); *id.*, A152:21–25 (S. Wolf).

[12]*See id.*, A084:15 – A086:11 (Ms. Ward); *id.* at A110:18 – A111:18 (Mr. Ward); *id.* at A121:24 – A122:4 (S. Wolf).

4

his wife had worked out,[13] and Target did not try to discuss it with him; Target was trying only to reach Ms. Ward.

Mr. Ward treated the number that Target was calling as a shared number, and told Target nothing from which Target could have concluded that it wasn't Ms. Ward's number. More than once, according to Mr. Ward's own testimony, he told Target's callers that his wife wasn't home[14] and that he would give her a message.[15] He never told a Target caller that his wife should be called at a different number.[16] According to Mr. Ward, Target's callers were never rude or threatening.[17]

---

[13]*Id.*, A106:22–24 (Mr. Ward).

[14]*Id.*, A113:22 – A114:5 (Mr. Ward).

[15]*Id.*, A114:6–11 (Mr. Ward).

[16]*Id.*, A114:12–15 (Mr. Ward).

[17]*Id.*, A104:15–16 (Mr. Ward).

I.    **The appeal of the claim under the Florida Consumer Collection Practices Act involves only a question of law: whether the Bankruptcy Court is correct that calling a debtor who has expressed an inability to pay the debt constitutes harassment as a matter of law.**

The Appellee argues that "[t]here was sufficient evidence from which the factfinder could find Target violated the FCCPA,"[18] and that "[t]he Bankruptcy Court's credibility determinations, weighing of the evidence, findings of fact and conclusions are entitled to a high degree of deference and should not be disturbed"[19] — as if the issue on appeal was the Bankruptcy Court's factual findings. There is no such factual issue. The only issue on appeal of the claim under the Florida Consumer Collection Practices Act is a question of law: whether the Bankruptcy Court is correct that calling a debtor who has expressed an inability or unwillingness to pay the debt constitutes harassment as a matter of law. The Bankruptcy Judge believed that the answer was yes, and said so both before[20] and after the

_____

[18]Appellee's Answer & Resp. [Doc. 22] at 17.

[19]*Id.* at 13.

[20]Hearing Tr., A065:12–25 ("I'm going to want to see evidence why does Target continue to call, period, instead of just suing").

6

trial.[21] The ruling on the claim under the Florida Consumer Collection

Practices Act turns on that view and, if that view is incorrect, then so is the

ruling. The standard of review is de novo.[22]

    As Target argued in its opening brief, calling a debtor who will not

pay does not violate the Florida Consumer Collection Practices Act; there is

no explicit requirement that a creditor stop calling a debtor if the debtor

can't or won't pay, or asks that the creditor cease communication; and a

creditor can call a debtor who can't or won't pay, or who asks that the

creditor cease communication, without violating the Florida Act as a matter

of law; and a creditor may keep calling a debtor who will not pay as long as

the calls are made for permissible purposes and cannot "reasonably be

expected to abuse or harass the debtor."[23] No court in Florida (or elsewhere),

other than the Bankruptcy Court here, has ever held that calling a debtor

---

[21]Hearing Tr., A249:21 – A250:11 ("I think it can reasonably be
expected to harass a Debtor or a member of the Debtor's family to keep
calling after the person has said, 'Stop calling,' or she's filing bankruptcy or
'we can't afford it.'").

[22]*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291,
1296 (11th Cir. 2009) ("we review the bankruptcy court's factual findings
for clear error, and its legal conclusions de novo").

[23]Target's Br. [Doc. 15] at 19–27.

who has expressed an inability to pay the debt constitutes harassment as a matter of law.

The Appellee responds to Target's arguments by saying that "the language in the FDCPA is significantly different from the language in the FCCPA. For example, the FCCPA does not require the plaintiff to put in writing a cease communications or refusal to pay directive"[24] — implying that the Florida Act contains an analog to the federal law's cease-communications provision,[25] just without the "in writing" requirement. In fact, the Florida Legislature did not adopt the "ceasing communication" provision at all — with or without the "in writing" requirement — and the Florida Act does not incorporate provisions from the Fair Debt Collection

---

[24]Appellee's Answer & Resp. [Doc. 22] at 19.

[25]*See* 15 U.S.C. § 1692c(c) (ceasing communication). In earlier versions, which did not pass Congress, "the consumer's notice was not required to be in writing." National Consumer Law Center, *Fair Debt Collection* § 5.3.9.1 n.445 at 228 (8th ed. 2014) (citing H.R. 13720, 94th Cong. § 804(d) (1976); H.R. 29, 95th Cong. § 805(d) (1977)). But in the enacted statute, written notice is essential, and a claim for violation fails unless the consumer asked *in writing* that the collector cease communication. *See Sembler v. Attention Funding Trust*, No. 07 CV 2493(RJD)(LB), 2009 WL 2883049, at *3 (E.D.N.Y. Sept. 3, 2009) ("Plaintiff fails to allege that he demanded in writing that the defendants cease communication. Without this, plaintiff fails to state a claim that defendants' ongoing communications were unlawful."), *report & recommendation adopted*, 2009 WL 3055347 (E.D.N.Y. Sept. 24, 2009).

Practices Act that Florida did not adopt. A court cannot read that federal provision into the Florida statute where the Florida Legislature did not enact it. (And even if Florida had adopted the federal provision, Target would not have violated it.)

It is perfectly lawful for a creditor, collecting its own debt in its own name, to communicate directly with a debtor — even if the debtor can't or won't pay. The creditor cannot abuse that right, and must exercise it judiciously, in a way that does not "abuse or harass the debtor or any member of her or his family." But no such abuse or harassment is present here.

II.   **The figure of "111 calls" in the Appellee's brief includes calls that were not made to the Wards.**

The Appellee repeatedly claims that Target called the Wards "111 times."[26] But that number is inaccurate, since it includes calls that were not made to the Wards, but rather were made to other numbers that a skip-trace vendor provided:

Q      Okay. And for how long did Target call Ms. Ward?

---

[26]Appellee's Answer & Resp. [Doc. 22] at 13; *id.* at 21; *id.* at 22 (twice).

A       Our records indicate that we were calling through
        August. But looking at information from the deposition
        of Mr. Ward, the numbers we were calling in August did
        not belong to the Wards. So effectively, we were calling
        through the end of July.

Q       When you say Target was calling numbers that didn't
        belong to the Wards, why would it have been doing that?

A       We skip traced the account because people weren't
        answering the phone.

Q       Okay. And what do you mean by "skip trace"?

A       Went out to a vendor and, I don't know the specifics of
        how it works, but they provide us with another phone
        number.

Q       Okay. So how often — well, how often did Target call
        Ms. Ward about the 492 account?

A       Our records indicate that we made approximately 91 calls
        and then an additional 20 calls that aren't recorded in
        Target's system from A-One that didn't connect.

THE COURT: A-One is AllianceOne?

THE WITNESS: Correct, that's right. Thank you.

BY MR. MELENDEZ:

        Okay. So a total of 111 attempts by Target or
        AllianceOne; is that correct?

A       Correct.

Q       Okay.

A       And that's including the wrong phone numbers.

Q       Okay. If you don't include the wrong phone numbers, if
        you only include calls to the numbers that Ms. Ward gave
        on her application for the 492 account, how many calls?

A       Approximately 52.

Q       Over what period?

A       Over 55 days; so from June until the end of July.

10

Q      Okay. So — let me get this straight. So your testimony, then, is that Target was calling Ms. Ward at a number that she gave in June — it was calling those numbers in June and July about 52 times over that two-month period; is that correct?

A      Correct.

Q      And Target continued to call in August, but it was calling skip traced numbers that did not belong to the Wards; is that correct?

A      That's correct.[27]

Target called the Wards 52 times over 55 days.[28] Target never called more than six times in a single day, and "called that often only because nobody answered the phone."[29] Target reached a human being five times,[30] and never connected with Ms. Ward herself.[31] Target's callers were never rude or threatening.[32]

---

[27]Trial Tr., A138:25 – A140:18 (S. Wolf).

[28]*Id.*, A139:25 – A140:14 (S. Wolf).

[29]*Id.*, A140:15–20 (S. Wolf).

[30]*Id.*, A140:23–25 (S. Wolf).

[31]*Id.*, A140:21–22 (S. Wolf).

[32]*Id.*, A104:15–16 (Mr. Ward).

11

III.   **The cell-phone number that Target was calling was a joint line, so Ms. Ward could give prior express consent for calls to that line.**

With respect to the claim under the Telephone Consumer Protection Act, the Appellee argues that "[t]he proper question on appeal is not whether Donna Ward consented to Target dialer calls or if she could and did revoke her consent. The proper question is whether Target using a dialer called Ernest Ward on his wireless phone without his express consent,"[33] and that "Donna Ward could not legally consent for Ernest Ward."[34] But that argument ignores both the evidence and the Bankruptcy Court's findings.

The Wards' own evidence and testimony showed that they treated the cell-phone number that Target was calling as a joint line. The Wards jointly acquired two phone lines and, while they each used one of the two lines, they treated both lines as belonging to both of them. In their bankruptcy petition, they listed the two Verizon accounts; in the column for describing each account as "HUSBAND, WIFE, JOINT, OR COMMUNITY," they described both accounts as "J[oint]."[35] Mr. Ward himself testified that the

---

[33]Appellee's Answer & Resp. [Doc. 22] at 13.

[34]*Id.* at 28 (capitalization omitted).

[35]Voluntary Petition, sched. F at 3 [A239].

813.778.1034 number was a cell-phone line that his wife and he held jointly.[36]

More to the point, despite the Appellee's contention that "Target was never able to establish that Donna ward was an agent of Ernest Ward,"[37] the Bankruptcy Court found that both Ms. Ward and Mr. Ward were each other's agents with respect to the number.[38] Neither Party disputed that finding.

Both Ms. Ward and Ms. Ward evidently had common authority over the number (and Mr. Ward took messages for his wife at that number, thereby establishing himself as her agent for the purpose of reaching her at that number[39]). Ms. Ward could therefore give prior express consent for calls to the joint line, and she did so when her application for the -492 account listed her secondary phone as 813.778.1034. Mr. Ward agreed that he could not, and did not, revoke his wife's prior express consent.[40]

---

[36]Trial Tr., A112:14–21 (Mr. Ward).

[37]Appellee's Answer & Resp. [Doc. 22] at 29.

[38]Hearing Tr., A069:8 ("A spouse is the agent of the other"); *id.*, A070:2 ("the wife is an agent of the husband").

[39]Trial Tr., A114:6–11 (Mr. Ward).

[40]*Id.*, A107:21 – A108:11 (Mr. Ward).

## IV. Target's contractual consent provision is there so that Target can protect itself against disputed after-the-fact claims of oral revocation, not so that Target can keep calling.

The Eleventh Circuit has explicitly acknowledged that oral revocation is available "in the absence of any contractual restriction to the contrary."[41] Other courts have followed the Eleventh Circuit's lead and acknowledged that a contractual provision could alter the parties' relationship.[42]

This case is distinguishable from other oral-revocation cases because Ms. Ward's prior express consent was reinforced by a written agreement. Ms. Ward admits that she could not unilaterally modify her credit-card agreement.[43] She could not unilaterally modify the prior-express-consent provision any more than she could unilaterally modify the credit limit, interest rate, minimum payment, or other terms and conditions of her credit-card account. Mr. Ward agreed that he could not, and did not, revoke his wife's prior express consent.[44]

---

[41]*See Osorio*, 746 F.3d at 1255.

[42]*See, e.g.*, *Reid v. GE Capital Retail Bank*, No. CV 114-079, 2014 U.S. Dist. LEXIS 170267, at *7 (S.D. Ga. Dec. 9, 2014) (citing *Osorio*).

[43]Trial Tr., A091:1–12 (Ms. Ward).

[44]*Id.*, A107:21 – A108:11 (Mr. Ward).

14

Target does not take the view that, once a cardholder has given prior express consent for autodialed calls, Target will keep calling the cardholder even against the cardholder's wishes. When a cardholder asks that Target stop calling a particular number, Target honors that request, and Target's witness testified at the trial about the procedure for documenting such an oral revocation.[45] But an issue arises when, usually months (and sometimes years) after the fact, a cardholder says that he or she revoked consent but Target's records show something different. Target usually does not record such calls, and usually keeps what few recordings it does make only for a very limited time (ordinarily for 90 days), so Target's credit-card agreements all provide contractually for prior express consent as a way of protecting Target against after-the-fact claims of revocation where proof is difficult.

Target does not dispute that the credit-card agreement that applied to Ms. Ward's account was subject to the Telephone Consumer Protection Act. The contractual consent provision was included with the Act in mind:

"**COMMUNICATIONS WITH YOU —** We [Target] or our agents may call by telephone regarding your Account. You agree that we may place such

---

[45]Id., A150:20 – A152:20 (S. Wolf).

calls using an automatic dialing/announcing device. You agree that we may make such calls to a mobile telephone or other similar device. . . ."[46] That provision appears in the agreement so that Target can contractually protect itself against an after-the-fact claim of oral revocation of which Target has no record, where the consumer agreed to the contractual provision and has neither obtained the caller's consent to modify the contract nor furnished any consideration — exactly the kind of claim that the Appellee is making.

Here, Target's records contain no evidence that either Ms. Ward or Mr. Ward ever asked Target to stop calling the 813.778.1034 number[47] — the number that Ms. Ward provided on her credit-card application. Every Target caller who spoke with Mr. Ward on that number testified that he never asked that Target stop calling.[48]

---

[46]Credit Card Agreement, ¶ 12 [A221]; Trial Tr., A090:19–25 (Ms. Ward); *id.*, A123:10 – A124:2 (S. Wolf).

[47]Trial Tr., A152:13–20 (S. Wolf).

[48]*Id.*, A167:24 – A168:14 (V. Clark-Bogle); *id.*, A185:2–7 (L. O'Connell); *id.*, A186:3–19 (L. O'Connell); *id.*, A196:3–21 (T. White) (wrong party); *id.*, A209:12 – 210:7 (N. Nelson); *id.*, A214:17–18 (N. Nelson).

V.   **Mr. Ward never testified about June 7, 2010 call, so the Bankruptcy Court's finding is based on speculation.**

The Bankruptcy Court found that Mr. Ward told Target to stop calling him on June 7, 2010 — not based on any specific testimony or other evidence in the trial record, but because of the Bankruptcy Court's view that "June 7th is when Mr. Ward, a prior collector, would have told Target that this is his phone, not hers, they're not in a position to pay and don't call."[49] Based on that factually unsupported view, the Bankruptcy Court found that Target called 46 times after being told to stop.[50] But if the Court had relied on Mr. Ward's actual testimony, which Target's records partly corroborate, and found that Target was told to stop on July 12, then Target called Mr. Ward's cellular telephone only 13 times after being told to stop.

The Bankruptcy Court's finding about the June 7 call is speculation. The Appellee's brief compounds that speculation by conjecturing about what conversations occurred when based on how long each call lasted.[51] But Mr.

---

[49]Hearing Tr., A265:9–12.

[50]*Id.*, A265:7; *id.*, A266:10.

[51]Appellee's Answer & Resp. [Doc. 22] at 43–46.

17

Ward did not testify at all about the June 7 call, so the Court and the Appellee are putting words into his mouth.

Target's records do not show that Mr. Ward asked on the June 7 call for calls to stop.[52] If such a request had been made, then it would appear in the call notes[53] — but those notes say only, "Wrong party, Guest not home,"[54] which is consistent with Mr. Ward's testimony.[55] For the Bankruptcy Court to have disregarded Target's evidence in favor of speculation and conjecture, and without any supporting testimony from the witness himself, was clear error.

## VI.   The Appellee's accusation of "Target knowingly with[olding] call records" is an unwarranted smear.

Finally, the Appellee argues that "Target's records . . . were incomplete"[56] and that "Target's position . . . has changed" because "Target knowingly withheld call records evidencing significant calls and contacts."[57]

---

[52]*See* TSYS Notes, A227.

[53]Trial Tr., A151:24 – A152:9 (S. Wolf).

[54]TSYS Notes, A227.

[55]Trial Tr., A114:1–5 (Mr. Ward).

[56]Appellee's Answer & Resp. [Doc. 22] at 8.

[57]*Id.* at 41.

That argument is a half-truth, deliberately misleading, that has no bearing on this appeal.

By definition, a half-truth includes some truth, and it is true that Target did not originally realize that some calls had been made to the Wards by Target's vendor Alliance One. During discovery, Target produced a complete set of its own call records, not realizing that Alliance One had also placed 20 calls that did not appear in Target's records. Target itself discovered the omission, and promptly rectified it by supplementing its discovery responses and producing the newly discovered documents. Target did so while discovery was still underway, and the Plaintiff Trustee (now Appellee) subsequently took depositions — almost six months before the trial — both from Target's designated witness Susan Wolf and from the one Alliance One caller who spoke with Mr. Ward, Veronica Clark-Bogle. Ms. Wolf also testified at the trial, and Ms. Clarke-Bogle's deposition was played at the trial.[58]

There is no basis for the Appellee's accusation that Target "knowingly withheld" any information. There was never any need for a motion to

_____

[58]Trial Tr., A157:9 – A215:7.

19

compel, and nobody had to twist Target's arm before Target came forward

with the newly discovered documents. Before discovery ended, the Plaintiff

Trustee's attorneys were in full possession of the facts, and had a full

opportunity to follow up on the inadvertently omitted information. The

omission was an honest mistake, which Target promptly rectified as soon as

it discovered the omission. The Appellee suffered no prejudice. Regardless,

this issue is not before the Court on this appeal.

## Conclusion

Therefore, Appellant Target National Bank respectfully asks that this

Court reverse the Bankruptcy Court's judgment.


February 12, 2016.

<div style="margin-left: 40%;">

DYKEMA GOSSETT PLLC

/s/ Brian Melendez
_____
Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

in association with

</div>

21

Sherilee J. Samuel,
    Florida Bar No. 017499,
    sherilee.samuel@hwhlaw.com
R. Travis Santos,
    Florida Bar No. 077075,
    tstantos@hwhlaw.com
Hill Ward Henderson, PA
3700 Bank of America Plaza
101 East Kennedy Boulevard
Tampa, FL 33602
Ph. 813.221.3900
Fax 813.221.2900

Attorneys for Appellant
    Target National Bank

**Certificate of Compliance with Rule 8015(a)(7)(B)**

This brief complies with the type-volume limitation of Rule

8015(a)(7)(B) because this brief contains 3,519 words, excluding the parts of

the brief exempted by Rule 8015(a)(7)(B)(iii).

February 12, 2016.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez

_____

Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Attorney for Appellant
    Target National Bank

**Certificate of Service**

I hereby certify that on February 12, 2016, I electronically filed the foregoing brief with the Clerk of the Court by using the CM/ECF system, which effected service upon George C. Bedell, III, Kenneth C. Grace, and Thomas A. Lash, attorneys for the Plaintiff-Appellee Trustee.

February 12, 2016.

DYKEMA GOSSETT PLLC

/s/ Brian Melendez
_____
Brian Melendez
Florida Bar No. 0103559
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Ph. 612.486.1589
Fax 877.599.6688
bmelendez@dykema.com

Attorney for Appellant
    Target National Bank